IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| BRIAN JAMES AZURE, | Cause No. CV 25-72-GF-DLC |
| Plaintiff, | |
| vs. | ORDER |
| PAUL ALAN KUMMER, CLAYTON HENDERSON, ADAM HUNT, ZACHARY HATTAN, and NICHOLAS BOWLEY, | |
| Defendants. | |

There are four fully-briefed motions pending before the Court. Plaintiff Brian James Azure has moved to exclude Defendants' liability expert and for summary judgment. (Docs. 39 and 41.) Defendants have moved for a protective order and also for summary judgment. (Docs. 43 and 48.) Plaintiff's motions to exclude and for summary judgment are denied. Defendants' motion for a protective order is granted. Defendants' motion for summary judgment is denied, in part, and granted, in part.

## I.      BACKGROUND

Plaintiff Azure, at the time of filing his Amended Complaint, was a pretrial detainee at Cascade County Detention Center in Great Falls, Montana. (Doc. 10 at

1

6.) His Amended Complaint alleges violations of his constitutional rights against Great Falls Police Officers Paul Alan Kummer, Clayton Henderson, Adam Hunt, Zachary Hattan, and Nicholas Bowley. (Doc. 10 at 2 – 5.)[1]

The following brief summary of Azure's Complaint will be supplemented as needed below. Azure's claims arose from an incident at a casino in Great Falls, on July 4, 2025. (Doc. 10 at 8.) Azure went into the bathroom at the casino around midnight. Sometime later, an employee of the casino called the police and stated that a man with needles was refusing to leave the bathroom and possibly putting things in its vents. Police officers responded and entered the bathroom. Defendant Kummer looked over the stall at Azure and told him to exit the stall or he would be tased. Kummer told Azure several times to unlock the stall, and Azure did not. Defendant Bowley was in the restroom, as well, but appears to have had a limited role, at least at first. (Doc. 45-4 at 3.)

At some point, Kummer requested additional officers to attend the scene. (Doc. 45 at 4.) Defendant Hattan arrived at the casino and entered the bathroom. (Doc. 45 at 5.) Kummer and Azure were having verbal back-and-forth, with Kummer instructing Azure to put his hands on his head, and Azure inquiring about why he was being arrested. Azure did put his hands on his head. Hattan realized

---

[1] Several other defendants were previously dismissed from this lawsuit. (Docs. 11 and 31.)

the stall door could be opened from the outside, so he used a knife to do so. (Doc. 45 at 6.) Azure was directed to face the wall, but he did not. Azure moved to the floor, but a physical altercation ensued, in which Azure was struck in various ways by the police. Eventually, Azure was subdued and transported to the hospital, where he had suffered fractured ribs, a concussion, and a pneumothorax. He was charged with trespassing, assault on a police officer, and resisting arrest. He was not taken into custody but instead spent two days in the hospital.

## II.    MOTIONS FOR SUMMARY JUDGMENT

Plaintiff and Defendants have both filed motions for summary judgment. (Docs. 41 and 43.) Defendants' motion is properly supported by a Statement of Undisputed Facts and related documents. (Doc. 45.) Plaintiff's motion, on the other hand, is not properly supported and violates D. Mont. L.R. 56.1 by not including a Statement of Undisputed Facts. (Doc. 41.) L.R. 56.1(d) states that "failure to file a Statement of Undisputed Facts will be deemed an admission that materials facts are in dispute." Azure did file a "Motion of Disputed Facts" in response to Defendants' motion. (Doc. 50.) This document will be construed as Azure's opposition to Defendants' motion, and Azure's motion itself will be denied for failure to comply with the local rule. His motion will be considered, however, to the extent that it makes legal arguments in opposition to Defendants' positions.

Defendants assert they are entitled to judgment as a matter of law because

officers had probable cause to arrest Azure, and they did not use excessive force in doing so. (Doc. 44 at 2 – 3.) Defendants also assert they are entitled to qualified immunity. (Doc. 44 at 3.)

### A. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it impacts the outcome of the case in accordance with governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All reasonable inferences must be viewed in the light most favorable to the nonmoving party. *Tatum v. Moody*, 768 F.3d 806, 814 (9th Cir. 2014). Nonetheless, the nonmoving party must identify, with some reasonable particularity, the evidence that it believes precludes summary judgment. *See Soto v. Sweetman*, 882 F.3d 865, 870 (9th Cir. 2018) (explaining that while pro se parties are exempted from "*strict* compliance with the summary judgment rules," they are "not exempt[ed] . . . from *all* compliance," such as the requirement to identify or submit competent evidence in support of their claims). The Court will, to the extent feasible, interpret Azure's filings as the basis of his disputed facts, despite Azure's failure to comply with L.R. 56.1(b), while recognizing that "a

district court has no independent duty to scour the record in search of a genuine issue of triable fact…" *Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010).

### B. Probable Cause

Azure's motion for summary judgment explicitly asserts only an excessive force claim, but Azure also appears to question Defendants' probable cause to arrest him. (Doc. 41 at 1 – 2.) Accordingly, Defendants move for summary judgment on the issue of whether they had probable cause to arrest Azure. (Doc. 44 at 14.) They assert they had probable cause to arrest Azure for trespass and obstructing a peace officer. (Doc. 44 at 15 – 19.)

At approximately 12:43 a.m. on July 5, 2025, Harmony Ziegler, the manager at the casino where Azure had entered the restroom, called 9-1-1 and reported a man refusing to leave the bathroom and in possession of drugs. (A recording of this call is in the record at Doc. 45-2, Exh. A.) Azure disputes the veracity of Ziegler's allegations, but does not dispute the fact of the call. (Doc. 50 at 1.) Azure claims he did not speak with or see Ziegler, and she would have no way of knowing what he was doing in the bathroom stall. *Id.*

In response to the call, Defendants Kummer and Bowley arrived at the casino. (Doc. 45 at 3.) They first spoke with Ziegler. Then they went into the restroom. Kummer stood on the urinal and looked over into the bathroom stall to

see Azure. At this point, Azure was either done using the toilet, as he asserts, or had never used it at all, as Defendants assert. Cf. Doc. 45 at 3 and Doc. 45-1 at 5 – 6. Defendant Kummer twice told Azure to unlock the door and come out of the stall. When Azure did not do so, Kummer unholstered his taser and pointed it at Azure. Defendant Bowley attempted to open the stall door. (Doc. 41 at 8.) Kummer told Azure he was under arrest for trespassing and must leave the stall. (Doc. 45 at 4.)

Montana's law for trespass includes remaining unlawfully in an occupied structure. Mont. Code 45-6-202. Privilege to remain "may be revoked at any time by personal communication of the landowner or other authorized person…" Mont. Code Ann. § 45-6-201. Defendants had probable cause to arrest Azure for trespass, because they told him he was to leave, based on the expressed wish of the manager, and he did not. Whether they had additional probable cause to arrest him for obstructing a peace officer is disputed and will not be considered. (Doc. 44 at 18 – 19.)

### C. Excessive Force

The more difficult question is whether Defendants used excessive force in their arrest of Azure. Azure had a constitutional right not to suffer excessive force during his arrest. The Fourth Amendment guarantees citizens the right "to be secure in their persons ... against unreasonable ... seizures." U.S. Const. amend. IV.

However, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor,* 490 U.S. 386, 396 (1989).

Force is unconstitutionally excessive if it is "objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Objective reasonableness turns on the "facts and circumstances of each particular case." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* (citing *Graham*, 490 U.S. at 396).

> The following considerations bear on the reasonableness of the force used: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. The most important factor is whether the suspect posed an immediate threat. This analysis is not static, and the reasonableness of force may change as the circumstances evolve.

*Hyde v. City of Willcox*, 23 F.4th 863, 870 (9th Cir. 2022) (internal citations and quotations omitted). "[W]e examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case…" *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (internal quotations and citations omitted). "Although [an] attempt to craft an easy-to-apply legal test in the Fourth

Amendment context is admirable, in the end we must still slosh our way through the factbound morass of "reasonableness."" *Scott v. Harris*, 550 U.S. 372, 383 (2007).

To determine whether the Defendants' actions were objectively reasonable, the Court must first ascertain the relevant facts. As pointed out above, the parties disagree about several facts, specifically regarding the degree of threat posed by the defendant, whether or how he was resisting arrest, and whether any force was necessary. "When things are in such a posture, courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the motion," *Scott,* at 378 (internal quotations and citations omitted), in this case, Plaintiff Azure.

The *Hyde* factors identified above provide the framework for the Court's determination of the relevant facts. *Hyde*, at 870. The first part of the Court's analysis must focus on Azure's behavior, which undergirds three of the relevant *Hyde* factors: the severity of the security problem at issue; the threat reasonably perceived by the officers; and whether the plaintiff was actively resisting. *Id*.

1.  Severity of security problem

"[F]elonies not involving violence provide limited support for the use of significant force under *Graham*." *Bryan*, 630 F.3d at 829 n.12. At the time of Defendants' initial engagement with Azure, the only crime they believed he had

committed was trespass, which is a non-violent misdemeanor. Mont. Code Ann. §

45-6-203(2). "While the commission of a misdemeanor offense is not to be taken

lightly, it militates against finding the force used to effect an arrest reasonable

where the suspect was also nonviolent and posed no threat to the safety of the

officers or others." *Bryan v. MacPherson*, 630 F.3d 805, 828–29 (9th Cir. 2010)

(internal quotations and citations omitted).

The only crimes Defendants were aware Azure had committed were trespass

and obstructing a peace officer, and he only did so by continuing to occupy the

toilet stall for some minutes after the officers told him to exit. The record in this

case includes the audio recording of Defendant Bowley's police car camera, which

is in the record at Doc. 45-4, Exh. B. The recording is seventeen minutes long, and

covers the period of the Defendants' initial interaction with Azure in the stall until

he is placed on the back seat of the police car. Nothing about Azure's initial

conduct or the situation amounted to a severe security issue. But Defendants argue

that Azure "engaged in a felony-level use of violence" after the altercation became

physical, thus justifying the Defendants' use of force. (Doc. 44 at 25.) Defendants

cite a Southern District of California case for the proposition that a suspect's

felony-level use of violence may justify the use of significant force. (Doc. 44 at 25,

citing *Wilson v. Unknown Oceanside Police Officers*, 2025 WL 97599, at *7 (S.D.

9

Cal. 2025).) The reasonableness of force used "may change as the circumstances evolve." *Hyde v. City of Wilcox*, 23 F.4th 863, 870 (9th Cir. 2022).

*Wilson* also involved a scenario in which a person was refusing to leave a bathroom stall. But in *Wilson*, as soon as he was touched, the plaintiff "formed a fist with his right hand and swung" at the officer. *Wilson v. Unknown Oceanside Police Officers*, No. 23-CV-270-TWR-DDL, 2025 WL 97599, at *3 (S.D. Cal. Jan. 14, 2025), *report and recommendation adopted*, No. 23-CV-270 TWR (DDL), 2025 WL 418750 (S.D. Cal. Feb. 6, 2025). In contrast, in Azure's version of events, his hands were on his head, and he was going to his knees before he was roughly grabbed and dragged from the cell. At that point, he started to thrash. The initial severity of the situation was low. Whether Defendants could have avoided any security issue or use of force altogether with greater patience, is a matter of dispute.

2. Threat reasonably perceived by the officer

The most important of the *Graham* factors is whether the plaintiff posed an immediate threat to the safety of the officer or others. *Smith v. City of Hemet,* 394 F.3d 689, 702 (9th Cir.2005) (en banc), *cert. denied,* 545 U.S. 1128 (2005). There are no facts to establish that Azure was an immediate threat. The witness who had summoned Defendants did not tell them Azure had a weapon, and they did not observe one available to him when they looked over the stall at him. (Doc. 45 at 3 -

4.) Defendant Kummer states, in his incident report, that he did not know if Azure was armed with a knife or concealing weapons, causing Kummer to draw and activate his taser. (Doc. 45-3 at 6.) Defendants suggest he may have had a needle concealed in his hand. (Doc. 44 at 27.) But there was no visible weapon in the toilet stall with Azure.

Very early in the parties' interaction, Azure placed his hands on his head. This can be heard on audio recording. Doc. 45-4, Exh. B. By 55 seconds into the recording, when the stall door is still closed, Azure states that his hands are on top of his head, in response to the question, "Are you going to open the door?" Thus, prior to the initiation of any physical altercation between the individuals, Defendants knew, at the very least, that Azure did not have a knife in his hand. Hattan states that Azure was facing away from him when Hattan entered the stall, and that even though his hands were on top of his head, his right hand was clenched, making Hattan unsure if there was anything in that hand. (Doc. 45-5 at 5.) But no officer saw a weapon or knew that Azure possessed one. Azure was outnumbered by the three officers, Kummer, Bowley, and Hattan. Kummer, at least, had his taser drawn. There was nothing objectively threatening about Azure in this situation. Despite Defendants' asserted concerns that he might possess some kind of weapon, they clearly knew that he did not possess an available serious one, such as a gun or a knife, and the three of them could reasonably expect to subdue

11

him in the tight quarters of the restroom.

3. Plaintiff actively resisting

As to the third factor, whether he was actively resisting, the record is equivocal. " "Resistance" […] should not be understood as a binary state, with resistance being either completely passive or active. Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer. We must eschew ultimately unhelpful blanket labels and evaluate the nature of any resistance in light of the actual facts of the case." *Bryan,* 630 F.3d at 830. The parties agree that Azure did not follow various commands regarding his arrest. Azure asserts his memory is vague on exactly what happened. (Doc. 50 at 6.) Azure claims, supported by the audio, that he announced he was not resisting and was going to the ground.

Defendants tell a different story. The most objective evidence is the audio recording of Defendant Bowley's camera. (Doc. 45-4, Exh. B.) The recording supports aspects of both sides of the story. Much of the dialogue is as reported, with Azure sounding agitated, upset, and in pain, but also complying with some directions, such as to put his hands on his head, and not with others. Azure expresses pain throughout the interaction, including afterwards. What is not clear, and cannot be clear via audio, are Azure's actions, including whether he was kicking or posing any serious threat to Defendants, how many times Defendants

struck Azure, with what force, and with what justification, if any. There are long stretches of silence on the recording, where scuffling is heard but what is happening is unknowable. By four minutes, Azure can be heard saying repeatedly that he can't breathe, "Get off of me," "Quit pushing on me," and "I'm being crushed." It also sounds like one of the Defendants says something like "it's crackhead behavior", "the meth's talking." By six and a half minutes on the tape, Azure is subdued, occasionally making sounds of pain, and sounding very muffled. The next several minutes of the tape are transferring Azure to the car and his expressions of evident pain. Azure is visible for the first time at nine minutes, when he is placed o of the car and can be seen on the car video.[2] Eventually an ambulance arrives to take Azure to the hospital.

Azure did continue to resist doing what Defendants told him to do, but given the admitted use of strikes by Defendants, how to interpret this resistance is unclear. Nonetheless, for the purpose of this analysis, it suffices to say that Azure did not comply with every command given to him, and could have been considered to be resisting to some degree, depending on his actions once he was lying on the floor.

    4. The amount of force used

---

[2] The parties never comment on Azure's stature, but his appearance on the video reveals that he is not physically imposing.

The Court turns, then, to the next *Hyde* factor, the amount of force used, to see if the officers acted appropriately. "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. This analysis includes considering any effort made by the officer to temper or to limit the amount of force. "Rather than relying on broad characterizations, we must evaluate the nature of the specific force employed in a specific factual situation." *Bryan*, 630 F.3d at 825.

There appears to be no factual dispute about certain aspects of the force used against Azure. Azure claims that, by their own admission, Defendants employed five closed-fist blows to the head, a choke hold, an officer sitting on his back or chest, and holding his arms and legs. (Doc. 53 at 2 – 3.) Defendants' Statement of Undisputed Facts uses different terminology, such as "a front headlock to get control of" Azure's head, an "elbow strike to the right mid-section," "plac[ing] a hand on the side of [Azure's] face," and "deploy[ing an] expandable baton and h[olding] it over his ankles why applying pressure." (Doc. 45 at 8 – 9.) In any event, Defendants took Azure to the hospital after he said he was in pain and having trouble breathing, and he was diagnosed with three broken ribs, a collapsed lung, and a concussion. (Doc. 45-1 at 13.)

Defendants cite a District of Montana case in support of their conclusion that

14

strikes with a closed fist are a "low level" of force. (Doc. 44 at 21 (citing *Slevira v. Billings Police Dep't*, 2025 WL 2029903, at *6 (D. Mont. 2025).) However, in *Slevira*, the Court had the benefit of a video recording, making assessment of the severity of the strikes possible. The plaintiff in that matter possessed a firearm and was suspected of a homicide; he was not a man occupying a toilet stall against the wishes of a casino proprietor. Defendants here do not assert that Azure landed a blow on any of them while he was resisting arrest; he is only alleged to have kicked his legs, and grabbed one officer's arm.

Striking a person's head can create "a substantial risk of death or serious bodily injury." *Bryan v. MacPherson*, 630 F.3d 805, 825 n. 6 (9th Cir. 2010) (defining lethal force as force that creates such a risk). *See also Blankenhorn v. City of Orange*, 485 F.3d 463, 480 (9th Cir. 2007) (holding that a rational jury could find an officer's punches unjustified if the plaintiff did not pin his arms underneath his body). Landing five blows to the head of a person pinned to the floor by three officers and deploying an elbow that broke multiple ribs could be considered more than a low level of force.

Defendants have not established the lack of a genuine dispute regarding their use of force. The crime under investigation was at most a non-violent misdemeanor, and the suspect was apparently unarmed. There were no dangerous or exigent circumstances apparent at the time of the detention that required an

15

immediate forceable arrest, and the officers outnumbered the plaintiff. *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1014 (9th Cir. 2002). Defendants are entitled to summary judgment on the issue of probable cause, but not on the issue of the use of force.

### III.    QUALIFIED IMMUNITY

Defendants assert that, even if their use of force was excessive, they are entitled to qualified immunity, because their actions did not violate clearly defined and established law. (Doc. 44 at 29 – 30.) "'Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Stanton v. Sims*, 572 U.S. 3, 6 (2013) (citations omitted). Even where excessive force is used, an officer may be entitled to qualified immunity at the shifting border between excessive and reasonable force. *See Taylor v. Riojas*, 592 U.S. 7, 8–9 (2020) (per curiam).

To determine if an official is entitled to qualified immunity a court considers two factors: (1) whether the facts as alleged state a violation of a constitutional right, and (2) whether the right is clearly established, such that a reasonable official would have known that his or her conduct was unlawful. *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (*receded from* by *Pearson v. Callahan*.)  Disputed facts prevent

the Court from making the first determination—whether a constitutional violation occurred—so the second question will be considered.

In determining whether a right is clearly established, this Court first looks to binding precedent from the Supreme Court or the Ninth Circuit. *Boyd v. Benton Cnty.*, 374 F.3d 773, 781 (9th Cir. 2004). The Supreme Court has advised that "courts generally 'need to identify a case where an officer acting under similar circumstances ... was held to have violated' the Constitution." *Zorn v. Linton*, 607 U.S. \_\_\_, 146 S.Ct. 926, 930 (2026) (per curiam) (quoting *Escondido v. Emmons*, 586 U.S. 38, 43 (2019) (per curiam)), and that "officers receive qualified immunity unless they could have 'read' the relevant precedent beforehand and 'know[n]' that it proscribed their specific conduct," *id.* (quoting *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 616 (2015) (alteration in original).

What, exactly, happened is disputed, and thus, the parameters of clearly established law cannot be determined. But there is certain precedent in the Ninth Circuit that could have advised Defendants that their conduct was unconstitutional, depending on exactly what happened. In *Hopkins v. Bonvicino*, the Ninth Circuit confirmed that officers used excessive force where the "crime under investigation [is] at most a misdemeanor[,] the suspect [is] apparently unarmed and approaching the officers in a peaceful way," there "[are] no dangerous or exigent circumstances apparent at the time of the detention, and the officers outnumber[ ] the plaintiff."

17

*Id.* (citation and internal quotation marks omitted). 573 F.3d 752, 759, 776 (9ᵗʰ Cir. 2009.) *See also Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003) ("We need no federal case directly on point to establish that kneeling on the back and neck of a compliant detainee, and pressing the weight of two officers' bodies on him even after he complained that he was choking and in need of air violates clearly established law, and that reasonable officers would have been aware that such was the case"); *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1113–14, 1116 (9th Cir. 2017) (an officer's use of "a leg sweep maneuver to take down" a "willfully resist[ing]" college student was excessive force, despite the student posing "some threat" as he was "suspected of committing a [misdemeanor] battery" with water balloons); *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9ᵗʰ Cir. 2007) (a reasonable officer was "on notice that punching [a non-resisting and prone arrestee in the face and head with a closed fist] to free his arms when, in fact, he was not manipulating his arms in an attempt to avoid being handcuffed" constituted excessive force); *LaLonde v. County of Riverside*, 204 F.3d 947, 952, 959 (9th Cir. 2000) (reversing a district court's decision to grant qualified immunity when a jury could reasonably find that the officer seriously injured a prone arrestee, whose resistance had ceased, by applying his knee to the arrestee's back).

18

"[W]hen there are disputed factual issues that are necessary to a qualified immunity decision, these issues must first be determined by the jury before the court can rule on qualified immunity." *Morales v. Fry*, 873 F.3d 817, 824 (9th Cir. 2017). Here, there are numerous genuine disputes of material fact that preclude a grant of summary judgment on qualified immunity. *S.R. Nehad v. Browder*, 929 F.3d 1125, 1140 (9th Cir. 2019). The case must proceed to trial. *Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018).

## IV.    PLAINTIFF'S MOTION TO EXCLUDE EXPERT

Plaintiff Azure objects to Defendants' Expert Jaeson D. White's executive summary of opinions and seeks to "exclude Defendants' disclosure of liability experts motion." (Doc. 39.) The first part of Azure's motion recounts various facts related to this case and Azure's interpretation of them, including filings related to his criminal case. (Doc. 39 at 2.) These contentions appear to be specific responses to White's expert disclosure. Azure concludes that White "has entered a frivolous opinion as he failed to review all documents and facts for a finalized expert or professional report." (Doc. 39 at 4.)

Defendants appropriately interpret this filing as a motion in limine to exclude White's testimony, and respond accordingly. (Doc. 42.) They respond that Azure's motion to exclude White is not the proper mechanism to resolve factual disputes. (Doc. 42 at 6.) Defendants assert that White's opinion evidence is

19

admissible under Fed. R. Civ. P. 702, because White is qualified, and his opinion is relevant and reliable. (Doc. 42 at 7.)

A court will grant a motion in limine and exclude evidence only if the evidence is 'inadmissible on all potential grounds;'" in all other cases, "evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *BNSF Ry. v. Quad City Testing Lab., Inc.*, 2010 2010 WL 4337827 at *1 (D. Mont. Oct. 26, 2010). Such is the case here. Azure's arguments go to the strength of White's conclusions and not to White's qualifications. White is clearly qualified to opine on proper police procedure. Whether his ultimate opinion regarding the conduct of these officers is accepted by the jury will depend on cross-examination and the evidence produced at trial. *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193 (9th Cir. 2014). The testimony will not be excluded. Azure's motion is denied.

## V.     DEFENDANTS MOTION FOR A PROTECTIVE ORDER

Defendants move for protective order, pursuant to Fed. R. Civ. P. 26(c). (Doc. 48.) Azure did not respond.

Defendants seek protection from Plaintiff's requests for admission that they consider untimely. (Doc. 49 at 2.) Defendants assert that Azure's request did not comply with the requirements of the Court's Scheduling Order, and thus, they are under no obligation to respond. (Doc. 49 at 5.) The deadline for discovery request

in this matter was May 5, 2026. Though Azure's request was dated May 5, it was not mailed until May 8, and was not received by Defendants until May 11. (Doc. 49 at 6.) This argument is not compelling. Inmate plaintiffs have little control over when their mail actually leaves the facility, and thus, the date they put the mail into the institution's mailing system is considered the date of filing, the so-called prison mailbox rule. *Orpiada v. McDaniel*, 750 F.3d 1086, 1089–90 (9th Cir. 2014) (discussing the concept in the context of habeas corpus). Azure notified the Court on May 5 that he had been returned to Cascade County Detention Facility. (Doc. 37.) Accordingly, Defendants' argument regarding the tardiness of Azure's request elevates a technicality out of Azure's control over the spirit of the rules.

Defendants' second argument, however, is persuasive. Azure's request for admission sought "admission of facts to the disclosure or statement of facts I filed." (Doc. 49-1 at 2.) Azure appears to seek either a fact-by-fact response to his disclosure, or a wholesale admission. Neither request is appropriate under Fed. R. Civ. P. 36. On this ground, Defendants' motion is granted. They are not obliged to respond to Azure's request.

## VI.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted, as to probable cause, and denied, as to excessive force and qualified immunity. Plaintiff's motions for summary judgment and to exclude Defendants'

21

expert. Defendants' motion for a protective order is granted.

Accordingly,

**IT IS HEREBY ORDERED**:

1.      Plaintiff's motion for summary judgment is **DENIED**. (Doc. 41.)

2.      Defendants' motion for summary judgment (Doc. 43) is **GRANTED, in part, and DENIED, in part**. A schedule for further proceedings will be entered by separate order.

3.      Plaintiff's motion to exclude liability expert is **DENIED**. (Doc. 39.)

4.      Defendants' motion for a protective order is **GRANTED**. (Doc. 48.)

5.      At all times, Plaintiff must update opposing counsel and the Court with any change of address. Failure to do so may result in dismissal. Fed. R. Civ. P. 41.

DATED this 17th day of July, 2026.

Dana L. Christensen, District Judge
United States District Court